**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NORTH ATLANTIC IMPORTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-999-GBW-SRF |
| | ) | |
| LOCO-CRAZY GOOD COOKERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

Pending before the court is the parties' claim construction dispute regarding one disputed term in United States Patent No. 10,660,473 ("the '473 patent"). The disputed term is "rib(s)." The '473 patent is generally directed to devices, systems, and methods for maintaining convection heat within a heating region of a griddle and channeling the convective heat to a single side of the griddle, away from the user. ('473 patent, Abstract) Plaintiff North Atlantic Imports, LLC ("Plaintiff") brought this civil action for patent infringement, violations of the Lanham Act, 15 U.S.C. § 1125(a), deceptive trade practices under 6 *Del. C.* § 2532, and false marking under 35 U.S.C. § 292 against defendant LoCo-Crazy Good Cookers, Inc. ("Defendant") on September 8, 2023, alleging that Defendant's propane griddle Model Nos. LCG3ST3C36 and LCG1STTC36 (the "Accused Products") infringe the '473 patent. (D.I. 1) Following a review of the parties' joint claim construction brief and associated materials (D.I. 67; D.I. 68), and after consideration of the arguments presented at the *Markman* hearing held on January 8, 2025, I recommend that the court construe the disputed term "rib" in accordance with its plain and ordinary meaning as "a structural member" for the reasons set forth below:

| Term | Recommended Construction |
|---|---|
| "rib[s]"<br>('473 patent, claims 1-4, 7, 10-13, and 17-20) | Plain and ordinary meaning, which is "a structural member." |

## I.    BACKGROUND

Plaintiff alleges that the Accused Products infringe claims 1 to 4, 7, 10 to 13, and 17 to 20 of the '473 patent (collectively, the "Asserted Claims"). The disputed claim term "rib" is found in each of the Asserted Claims. The specification explains that the ribs "serv[e] as channel portions for channeling convective heat" to specific heating regions of the griddle, and they "may also serve as stabilizers in substantially preventing the griddle from warping or partially warping." (*Id.*, col. 7:48-53) Figure 4 depicts a front-bottom view of the griddle showing the claimed front and lateral ribs at 96 and 98, respectively:



FIG. 4

Independent claim 10 of the '473 patent recites:

A griddle configured to control convection heat from one or more gas flame burners of a cooking station, the griddle comprising:

a cooking surface having a rectangular shape, the cooking surface configured to face upward;

2

an underside surface, the underside surface extending to generally correspond with the cooking surface, the underside surface facing in an opposite direction than the cooking surface, the underside surface extending to define a periphery with a front end, a rear end, a left end, and a right end;

a front rib having a front rib height and coupled to the front end of the underside surface, the front rib extending longitudinally along the front end of the underside surface; and

multiple lateral ribs each extending laterally relative to the front rib and extending along the underside surface from the front rib to the rear end of the underside surface, the multiple lateral ribs being spaced from each other so as to define multiple heating regions such that each heating region is defined between adjacently extending lateral ribs, the heating regions each configured to be positioned above a gas flame burner, each of the lateral ribs extend downward from the underside surface a lateral rib height such that the adjacently extending lateral ribs are configured to funnel the convection heat from the gas flame burner toward the rear end of the underside surface and away from a rear side of the cooking station;

wherein the front rib and the multiple lateral ribs are integrally formed with the underside surface; and

wherein the multiple lateral ribs directly extend from the underside surface such that each lateral rib is spaced and separate from an adjacent lateral rib.

(*Id.*, col. 11:19-52)

During prosecution of the application leading to the issuance of the '473 patent, the examiner issued a non-final rejection of the claims as being anticipated by Reynolds (U.S. Patent No. 4,715,356), finding the front and lateral rib limitations were met by the partition wall, baffles, heat reflective radiant panels, and ridge flange in Reynolds. (D.I. 68, Ex. D at JA0029-31) To overcome Reynolds, the applicant amended the claims to clarify that the front and lateral ribs of the claimed invention "are integrally formed with the underside surface of the griddle[,]" whereas the griddle in Reynolds rests on or is suspended above the housing walls of a cooking station. (*Id.*, Ex. D at JA0036, JA0041-42; Ex. E) The applicant further observed that the radiant panels and flanges in Reynolds are welded to adjacent radiant panels and flanges,

3

whereas each lateral rib in the claimed invention is spaced and separate from the adjacent lateral ribs. (*Id.*, Ex. D at JA0042)  The examiner issued a notice of allowance in response to these amendments without substantively addressing how the amendments overcame Reynolds. (*Id.*, Ex. D at JA0049-51)

On March 22, 2024, about six months after this lawsuit was filed, Defendant filed a petition for *inter partes* review ("IPR") with the Patent Trial and Appeal Board ("PTAB"), seeking review of claims 1 to 4, 6, 7, 10 to 13, 15 to 18, and 20 of the '473 patent. (*Id.*, Ex. B) In its response, Plaintiff proposed a construction of the claim term "rib" which mirrors Plaintiff's proposed construction in this case. (*Id.*, Ex. C at JA0021)  On October 8, 2024, the PTAB issued a decision instituting IPR proceedings and declining to adopt Plaintiff's proposed construction of "rib" as unsupported by the claim language or the specification. (*Id.*, Ex. J at JA0098-100) Specifically, the PTAB reasoned that the claimed function of the ribs is to provide a structure for "venting or channeling convection heat" from the burners, and other aspects such as structural rigidity to prevent warping are optional. (*Id.*, Ex. J at JA0099)  Moreover, the panel explained that the proposed construction lacked sufficient clarity for terms such as "strong" and "thick," which have no reference point. (*Id.*, Ex. J at JA0100)

## II.    LEGAL STANDARD

The purpose of the claim construction process is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  Construing the claims of a patent presents a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015) (citing *Markman*, 52 F.3d at 977-

78).  An actual dispute regarding the proper scope of a claim term must be resolved by a judge, as opposed to the jury.  *Markman*, 52 F.3d at 979.

"[T]here is no magic formula or catechism for conducting claim construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005).  Instead, the court may attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law."  *Id.*  The words of the claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1312-13 (internal citations and quotation marks omitted).  If the meaning of a claim term is not readily apparent, the court considers sources including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted).  Accordingly, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.  Claim terms are typically used consistently throughout the patent, and "usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

The claims must be read in view of the specification, which "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

5

Cir. 1996). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification may also contain a disclaimer or disavowal of claim scope. *Id.* However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted). The specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d

6

at 980.  Although extrinsic evidence "may be useful to the court," it is "less reliable" than

intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent

claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at

1318-19.  Where the intrinsic record unambiguously describes the scope of the patented

invention, reliance on any extrinsic evidence is improper.  *See Pitney Bowes, Inc. v. Hewlett-*

*Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

## III.    CONSTRUCTION OF "RIB[S]"

| Plaintiff's proposal | Defendant's proposal | Recommended construction |
|---|---|---|
| "an elongated raised piece of strong or thick material across a surface or through a structure, serving to support or strengthen the structure," consistent with the plain and ordinary meaning of the term. | No construction necessary – plain and ordinary meaning. | Plain and ordinary meaning, which is "a structural member." |

Both parties assert the term "rib[s]" should have its plain and ordinary meaning.  They

disagree on what that meaning is.  At the outset of the *Markman* hearing on January 8, 2025, the

court proposed that the term "rib" should be construed as "a structural member," consistent with

its plain and ordinary meaning, and gave the parties an opportunity to briefly meet and confer on

the proposal.  (1/8/2025 Tr.)  Defendant was amenable to the court's proposed construction.

(*Id.*)  Plaintiff expressed concern that the court's proposed plain and ordinary meaning would not

fully resolve the parties' dispute because it does not adequately capture Plaintiff's contention that

the claimed rib functions as a structural support.  (*Id.*)

Plaintiff's proposal emphasizes the structural nature of the ribs to stabilize the griddle and

prevent it from warping.  (D.I. 67 at 2-3)  Defendant responds that limitations regarding the

strength or thickness of the rib material are not required by the claim language or the

7

specification. (*Id.* at 11-13) The crux of the parties' dispute is whether the meaning of "rib" is expansive enough to encompass thin, non-structural sheets of metal. (*Id.* at 5)

The term "rib" does not require construction beyond a plain and ordinary meaning of "a structural member." *See Phillips*, 415 F.3d at 1312 (reiterating the general principle that the words of a claim "are generally given their ordinary and customary meaning."). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313. A person of ordinary skill in the art understands a claim term in the context of the claims and specification. *Id.* Here, the claims and specification describe how the ribs are structured and arranged to define heat regions and channels. ('473 patent, cols. 7:3-8, 8:46-65, 9:10-29, 10:31-38, 10:51-58) The claims do not describe the ribs as structural supports for the griddle.

In the context of the '473 patent, Plaintiff's proposed plain and ordinary meaning of "rib" is not consistent with the way ribs are described in the claims or specification. Plaintiff's proposal requires a rib to be elongated and strong or thick for purposes of supporting or strengthening the claimed structure. The specification permissively states that the front and lateral ribs "may be elongated," but the "elongated" characteristic of the ribs does not appear as an explicit requirement in the '473 patent. ('473 patent, col. 7:10-12; 7:20-22); *see United Therapeutics Corp. v. Liquida Techs., Inc.*, C.A. No. 23-975-RGA, 2024 WL 4503790, at *5 (D. Del. Oct. 16, 2024) (rejecting proposed "force" limitation where the limitation was supported only by examples in the specification and was not an explicit requirement). Similarly, the claims and the specification do not require the ribs to be strong or thick. *See Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) ("As a general proposition, a limitation that does not exist in a claim should not be read into that claim."). The '473 patent

8

does not contain the words "strong" or "strength," and only one reference to the ribs' thickness appears in the specification, stating that the "front rib length . . . extends with a consistent height [ ] and thickness." ('473 patent, col. 7:10-12) Because there is no requirement in the '473 patent that the ribs must be elongated, strong, or thick, there is no basis to adopt a proposed plain and ordinary meaning that includes these limitations.

Plaintiff's proposal to define the purpose of the ribs as structural support for the griddle also lacks a foundation in the intrinsic record. Both the claims and the specification describe the primary purpose of the ribs as defining heating regions and channels. ('473 patent, cols. 7:3-18; 7:54-63; 8:46-65; 10:31-38; 10:51-58; 11:34-47) Plaintiff cites a single embodiment in support of its position that the ribs "may also serve as stabilizers in substantially preventing the griddle from warping or partially warping." (*Id.*, col. 7:41-53) But the description of this embodiment makes clear that the primary purpose of the ribs is to "channel portions for channeling convective heat" and "define multiple heating regions of the griddle[.]" (*Id.*, col. 7:48-67) The permissive "may also" language chosen to connote the stabilizing characteristics of the ribs confirms that the ribs do not act as stabilizers in every embodiment. Although the claimed invention may possess more than one advantage or purpose, "there is no requirement that every claim directed to that invention be limited to encompass all of them." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention.").

Plaintiff's proposed plain and ordinary meaning for "rib" is also unsupported by the prosecution history. There is no dispute that Plaintiff did not clearly and unmistakably disavow any claim scope with respect to the term "rib" during prosecution. (D.I. 67 at 5-6, 10) The

examiner rejected the claims as anticipated by Reynolds, suggesting that the baffles, heat reflective radiant, and ridge flange made of "thin sheet metal" corresponded to the ribs claimed in the application leading to the issuance of the '473 patent. (D.I. 68, Ex. D at JA0029-30; Ex. E at JA0059, col. 5:7-10) Plaintiff amended the claims to overcome the rejection by requiring the ribs to be "integrally formed with the underside of the griddle." Plaintiff's response did not distinguish the thickness of the ribs as compared to the baffles and radiant in Reynolds or otherwise disavow ribs made of thin sheets of metal. (*Id.*, Ex. D at JA0041-42)

The PTAB's rejection of the same construction proposed by Plaintiff for "rib" is not binding on this court, but it is persuasive. *See EIS, Inc. v. IntiHealth Ger GmbH*, C.A. No. 19-1227-GBW, 2023 WL 346631, at *21 (D. Del. Jan. 9, 2023). The PTAB observed that none of the claim language referred to the ribs as "strong" or "thick" for purposes of strengthening or supporting the griddle structure, and the specification described the use of the ribs for structural rigidity only in the context of an optional embodiment. (D.I. 68, Ex. J at JA0098-99) The PTAB also explained that words like "strong" and "thick" "would introduce unnecessary ambiguity into the claims." (*Id.*, Ex. J at JA0100) For these reasons, the PTAB declined to adopt Plaintiff's construction and instead "appl[ied] the ordinary meaning to the term 'rib' in the challenged claims." (*Id.*)

Plaintiff acknowledges that extrinsic evidence in the form of dictionary definitions is "not necessary for determining the construction for such a common term," yet it cites several definitions of "rib" in various dictionaries. (D.I. 67 at 2) It is well-established that such extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Here, the dictionary

definitions cited by Plaintiff do not overcome the intrinsic evidence confirming that Plaintiff's proposal improperly narrows the scope of the claim term.

During the *Markman* hearing, Plaintiff expressed concern that the court's proposed plain and ordinary meaning of "a structural member" for the term "rib" would not fully resolve the parties' dispute. As explained by the PTAB, however, Plaintiff's proposal to add a supporting or strengthening requirement "would introduce unnecessary ambiguity into the claims." (D.I. 68, Ex. J at JA0100) The reasoning underlying this Report and Recommendation offers closure by clarifying that there is no supporting or strengthening requirement encompassed by the term "rib" in the context of the '473 patent.

## IV.    CONCLUSION

For the reasons set forth above, I recommend that the court decline to construe the disputed term beyond its plain and ordinary meaning:

| Term | Recommended Construction |
|---|---|
| "rib[s]" ('473 patent, claims 1-4, 7, 10-13, and 17-20) | Plain and ordinary meaning, which is "a structural member." |

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: January 8, 2025

_____
Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE